**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| **OPTICS INNOVATION LLC,** | |
| *Plaintiff,* | **No. 7:26-cv-203** |
| v. | **JURY TRIAL DEMANDED** |
| **APPLE INC.** | |
| *Defendant.* | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Optics Innovation LLC by and through its undersigned counsel, files this Complaint against Defendant Apple Inc. ("Apple" or "Defendant") for infringement of United States Patent Nos. 10,687,708, 10,623,705, 12,336,782, and 11,800,244 (collectively, "Asserted Patents") and alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action for infringement of the Asserted Patents arising under the patent laws of the United States, Title 35 of the United States Code, to obtain damages resulting from Defendant's unauthorized actions of making, having made, using, selling, having sold, offering to sell, importing, or having imported into the United States products that infringe or indirectly infringe of one or more claims of the Asserted Patents.

**THE PARTIES**

2. Plaintiff Optics Innovation LLC ("Optics" or "Plaintiff") is a corporation organized and existing under the laws of the state of Delaware with a place of business at 203 Anderson Street, Portland, ME 04101.

1

3.    On information and belief, Apple is a corporation organized and existing under the laws of the State of California and has regular and established places of business at 12545 Riata Vista Circle, Austin, Texas 78727; 6900 W. Parmer Lane, Austin, Texas 78729; and 1 Apple Park Way in Cupertino, California, 95014. Apple may be served with process through its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, TX 75201.

**JURISDICTION AND VENUE**

4.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 3 above.

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

6.    This Court has specific and general personal jurisdiction over Apple consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. This Court has personal jurisdiction over Apple at least because, through its own acts and/or through the acts of others acting as its agent, representative, or alter ego, it (i) has a presence or regular and established place of business in the State of Texas and this Judicial District; (ii) has purposefully availed itself of the rights and benefits of the laws of the State of Texas and this Judicial District; (iii) has done and is doing substantial business in the State of Texas and this Judicial District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including its one or more acts of infringement in the State of Texas and this Judicial District; (iv) maintains continuous and systematic contacts in the State of Texas and this Judicial District; and/or (v) places products alleged to be infringing in this Complaint in the stream of commerce, directly or through intermediaries, with awareness that

those products are likely destined for use, offer for sale, sale, and/or importation in the State of Texas and this Judicial District.

7.     Apple has established sufficient minimum contacts with the State of Texas and this Judicial District such that it should reasonably and fairly anticipate being brought into court in the State of Texas, including this Judicial District, without offending traditional notions of fair play and substantial justice; and Apple has purposefully directed activities at residents of the State of Texas, including this Judicial District. Moreover, the patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities. On information and belief, a substantial part of the events giving rise to Plaintiff's claims, including acts of patent infringement, have occurred in the State of Texas, including this Judicial District.

8.     Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400(b) because, among other things, Apple has committed acts of infringement in this District and has regular and established places of business in this District.

9.     Apple does business, offers to sell, and sells infringing products and services throughout the United States, this State, and this District, and introduces infringing products and services into the stream of commerce knowing that they will be sold in the United States, this State, and this District.

10.     Apple has authorized sellers and sales representatives and/or does business, offers for sale and/or sells products and services pertinent to this Complaint across the United States, including throughout this State, including in and to consumers throughout this District.

11.     Apple owns and operates the www.apple.com website, which is accessible by, through, and in this District and its residents.

12.     Apple owns, leases, and/or operates in or out of one or more offices and/or other facilities in this District.

13.     Apple maintains regular and established places of business within this District, including at: offices at 12545 Riata Vista Circle, Austin, Texas 78727 and 6900 W Parmer Lane, Austin, Texas 78729; manufacturing facility in Austin; engineering center at 320 S. Capital of Texas Hwy, West Lake Hills, Texas 78746; and retail stores located at 2901 S. Capital of Texas Highway, Austin, Texas 78746; 3121 Palm Way, Austin, Texas 78758; 7400 San Pedro Avenue, San Antonio, Texas 78216; 15900 La Cantera Parkway, San Antonio, Texas 78256; and 8401 Gateway Boulevard West, El Paso, Texas 79925. The Apple locations and facilities in this District are regular, physical, continuous, and established places of business. Apple established, ratified, and controls these places of business. Apple lists and describes these places of business on its own websites, on other public websites, and/or in its SEC filings. Apple employs thousands of employees at these places of business from which it conducts business, including the infringing conduct, in this District to its benefit.

14.     Apple develops, makes, uses, imports, offers for sale, and/or sells in Texas and this District products and services that infringe the Asserted Patents. Apple, directly and/or through intermediaries, ships, distributes, uses, offers for sale, sells, and/or advertises products and/or services in the United States, the State of Texas, and this District, including but not limited to infringing products as detailed below. Apple solicits and has solicited customers in the State of Texas and in this District. Apple has paying customers, who are residents of the State of Texas and this District, who each use and have used the infringing Apple products and services in the State of Texas and in this District.

15.     Apple maintains a permanent and/or continuing presence within this District, and/or has the requisite minimum contacts with this District such that this venue is a fair and reasonable one. Apple has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District, and has and continues to derive substantial revenue from infringing acts in this District.

## THE PATENTS-IN-SUIT

16.     The Asserted Patents relate to image capture devices, including smartphones and tablets.

17.     U.S. Patent No. 10,687,708 ("the '708 Patent"), is entitled "Method and Apparatus For A Compact And High Resolution Mind-View Communicator," and was duly and legally issued on June 23, 2020. The '708 Patent issued from U.S. patent application Serial Number 16/120,326, filed September 3, 2018 as a continuation of an application that issued as U.S. Patent No. 10,064,552. The term of the '708 Patent has not expired. The '708 Patent is valid and enforceable, and Optics Innovation LLC is the owner and assignee of all rights, title, and interest in the '708 Patent and, at a minimum, of all substantial rights in the '708 Patent, a copy of which is attached as Exhibit A. As such, Optics Innovation LLC has standing to sue and the right to recover damages for the infringement of the '708 Patent and pursue any and all causes and remedies, whether legal or equitable, related thereto.

18.     U.S. Patent No. 10,623,705 ("the '705 Patent"), is entitled "Method and Apparatus for a Wearable Imaging Device," and was duly and legally issued on April 14, 2020. The '705 Patent issued from U.S. patent application Serial Number 15/400,399, filed January 6, 2017 as a continuation of an application that issued as U.S. Patent No. 9.894,326 which is a continuation of an application filed June 4, 2010 that issued as U.S. Patent No. 8,872,910. The term of the '705

Patent has not expired. The '705 Patent is valid and enforceable, and Optics Innovation LLC is the owner and assignee of all rights, title, and interest in the '705 Patent and, at a minimum, of all substantial rights in the '705 Patent, a copy of which is attached as Exhibit B. As such, Optics Innovation LLC has standing to sue and the right to recover damages for the infringement of the '705 Patent and pursue any and all causes and remedies, whether legal or equitable, related thereto.

19.     U.S. Patent No. 12,336,782 ("the '782 Patent"), is entitled "Method and Apparatus For A Compact And High Resolution Mind-View Communicator" and was duly and legally issued on June 24, 2025. The '782 Patent issued from U.S. patent application Serial Number 18/431,800, filed February 2, 2024 as a continuation of an application that issued as U.S. Patent No. 11,937,895, which is a continuation of an application that issued as U.S. Patent No 11,432,723, which is a continuation of the '708 Patent. The term of the '782 Patent has not expired. The '782 Patent is valid and enforceable, and Optics Innovation LLC is the owner and assignee of all rights, title, and interest in the '782 Patent and, at a minimum, of all substantial rights in the '782 Patent, a copy of which is filed herewith as Exhibit C. As such, Optics Innovation LLC has standing to sue and the right to recover damages for the infringement of the '782 Patent and pursue any and all causes and remedies, whether legal or equitable, related thereto.

20.     U.S. Patent No. 11,800,244 ("the '244 Patent"), is entitled "Method and Apparatus For An Imaging Device" and was duly and legally issued on October 24, 2023. The '244 Patent issued from U.S. patent application Serial Number 17/887,435, filed August 13, 2022 as a continuation of an application that issued as U.S. Patent No. 11,716,449, which is a continuation of an application that issued as U.S. Patent No. 10,687,027, which is a continuation of an application that issued as U.S. Patent No. 9,894,326, which is a continuation of an application that issued as U.S. Patent No. 8,872,910. The term of the '244 Patent has not expired. The '244 Patent

is valid and enforceable, and Optics Innovation LLC is the owner and assignee of all rights, title, and interest in the '244 Patent and, at a minimum, of all substantial rights in the '244 Patent, a copy of which is filed herewith as Exhibit D. As such, Optics Innovation LLC has standing to sue and the right to recover damages for the infringement of the '244 Patent and pursue any and all causes and remedies, whether legal or equitable, related thereto.

21.     Each of the claims of the Asserted Patents is presumed to be valid.

22.     None of the claims of the Asserted Patents are directed to an abstract idea, and the claims limitations, individually and as an ordered combination, involve more than performance of well understood, routine, and conventional activities previously known to the industry as of the priority dates of the Asserted Patents.

23.     None of the claims of the Asserted Patents are directed toward fundamental economic practices, methods of organizing human activities, an idea itself, or mathematical formulations.

24.     The claims of the Asserted Patents are directed to a specific area of application of digital imaging and thus do not preempt others from using other methods and systems.

25.     The claims of the Asserted Patents also recite more than generic computer functionality and recite elements that were not purely conventional as of the priority dates of the Asserted Patents.

26.     The claims of the Asserted Patents recite specific improvements over prior art and conventional systems, apparatuses, and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the Asserted Patents, when such claims are viewed as a whole and in ordered combination, were not routine,

7

well-understood, conventional, generic, existing, commonly used, well-known previously known, or typical as of the earliest priority date of each of the Asserted Patents.

27.    None of the claims of the Asserted Patents are representative of the Asserted Patents' other claims or claims of the other Asserted Patents.

28.    The Asserted Patents address and overcome the limitations of smart phones, tablets, and digital imaging devices that are of a relatively small form factor. Such devices include cameras typically having smaller lenses and detector chips with lower pixel count and thus a lower image resolution. '708 Patent, 15:56–63; '705 Patent, 9:64–10:5; '244 Patent, 10:6–13; '782 Patent, 15:64–16:3. The Asserted Patents claim devices, including smartphones and tablets, that, among other things, comprise at least two cameras which are used to generate an output image that is an improvement over a conventional image generated by conventional imaging devices at the time of the Asserted Patents' priority dates.

29.    The '705 Patent is related to the '708 Patent through a shared grandparent patent, U.S. Patent No. 8,872,910. The subject matter of the '708 and '705 Patents is rooted in digital imaging technology and, as of their priority date, provides an unconventional solution to the problems with creating an image resembling human vision (centrally focused, with blurred peripherals) through use of a multi-camera device, such as smartphones and tablets, to calculate distance to an object in a scene.

30.    The asserted claims of the '708 and '705 Patents are directed to improving digital imaging technology through methods and apparatuses comprising a lower resolution camera and higher resolution camera capable of capturing images of a scene and at least one processor calculating the distance to an object in a scene and producing an output image in which portions

of the scene around the object are blurred in a manner that mimics the scene as if were to be viewed by human eyes.

31.    The '708 and '705 Patents describe existing devices that contain zooming features that are required to bring an object much closer to a viewer. '705 Patent, 2:66-3:7; *see also* '708 Patent, 4:8–14. The '708 and '705 Patents describe the solution of creating a human eye's view through an arrangement where two cameras capture "two views of every scene, a high resolution but narrow FOV and a lower resolution but wider FOV (similar to human peripheral view.)" '705 Patent, 10:57–61. "[W]ith two lenses [contained in the device], the distance of any object from the camera can be estimated." '705 Patent, 6:35–37; *see also* '708 Patent, 19:12–16 ("the object distance is estimated via triangulation applied to the scene recording cameras"). The '708 and '705 Patents further describe that "[f]or human like display, the resolution of the peripherals needs to be lowered." '705 Patent, 12:44–45.

32.    It is the capture by two cameras of two images of a scene containing an object by cameras having different image resolutions and fields of view, and executing a distance calculation of the object in the scene, that allows for the processor to create an output image that mimics how human eyes perceive the world (i.e., an object in focus, with out-of-focus periphery).

33.    The asserted claims of the '708 Patent expressly require a multi-camera imaging apparatus, such as smartphones and tablets, having the capability of capturing first and second images of a scene by cameras having different image resolutions and fields of view as well as, *inter alia*, "calculating, based on at least one of the first image and the second image, the distance of at least one object in the scene from the multi-camera device" and "generating, based at least upon the calculated distance of the at least one object in the scene from the multi-camera device and at least one of the received images, an output image corresponding to a portion of the scene

9

that is within the field of view of the first camera, wherein the output image having at least two image regions, an inner image region and an outer image region, the outer image region surrounding at least partially the inner image region, and at least a subset of the inner image region includes a portion of the at least one object, wherein the image resolution of the inner image region is higher than the image resolution of the first image and the image resolution of the outer image region is lower than the image resolution of the first image, and saving the output image" or, similarly, "calculating, based on at least one of the first image and the second image, the distance of at least one object in the scene from the imaging apparatus" and "generating, based at least upon the calculated distance of the at least one object in the scene from the imaging apparatus, an output image corresponding to a portion of the scene that is within the field of view of the first camera, wherein the output image having at least two image regions, an inner image region and an outer image region, the inner image region surrounded at least partially by the outer image region, wherein the image resolution of the inner image region is higher than the image resolution of the first image and the image resolution of the outer image region is lower than the image resolution of the first image." *See*, *e.g.*, '708 Patent, claims 1 and 8. These elements improve upon digital imaging technology. In particular, the processor uses the two images of a scene captured by separate cameras to calculate   the distance to an object in a scene and effectively applying the distance information to generate an output image that resembles a human eye's view of the object (i.e., an object in focus, with out-of-focus periphery). Thus, the asserted claims of the '708 Patent are directed to specific improvements to digital imaging and are not directed to an abstract idea.

34.    The asserted claims of the '708 Patent are directed to a specific field of application, a multi-camera image capture device, such as smartphones and tablets, or method, that utilizes a high resolution and lower resolution image to calculate distance from the cameras to an object for

the purposes of generating an output image with an inner area with increased resolution and a surrounding area with decreased resolution in order to emphasize the object. The asserted claims of the '708 Patent therefore do not preempt others from using the general concepts of image enhancement or image alteration.

35.    The asserted claims of the '708 Patent recite more than generic computer functionality and recite elements that were not purely conventional as of its priority date. The asserted claims of the '708 Patent recite at least the following steps or capabilities which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: capturing first and second images of a scene by cameras having different image resolutions an fields of view as well as "calculating, based on at least one of the first image and the second image, the distance of at least one object in the scene from the multi-camera device" and "generating, based at least upon the calculated distance of the at least one object in the scene from the multi-camera device and at least one of the received images, an output image corresponding to a portion of the scene that is within the field of view of the first camera, wherein the output image having at least two image regions, an inner image region and an outer image region, the outer image region surrounding at least partially the inner image region, and at least a subset of the inner image region includes a portion of the at least one object, wherein the image resolution of the inner image region is higher than the image resolution of the first image and the image resolution of the outer image region is lower than the image resolution of the first image, and saving the output image" or similarly, "calculating, based on at least one of the first image and the second image, the distance of at least one object in the scene from the imaging apparatus" and "generating, based at least upon the calculated distance of the at least one object in the scene from the imaging apparatus, an output image corresponding to a portion of the scene that is within the

11

field of view of the first camera, wherein the output image having at least two image regions, an inner image region and an outer image region, the inner image region surrounded at least partially by the outer image region, wherein the image resolution of the inner image region is higher than the image resolution of the first image and the image resolution of the outer image region is lower than the image resolution of the first image." *See, e.g.*, '708 Patent, claims 1 and 8. These elements were not well-known, routine, or conventional because of at least the capability of using a multi-camera device, such as smartphones and tablets, having two cameras that have different image resolutions and fields of view to capture a scene, and a processor to calculate based on the images the distance to an object within that scene, and use the distance to generate an output image with an inner area with increased resolution and a surrounding area with decreased resolution in order to emphasize the object did not exist in conventional imaging systems as of the priority date of the '708 Patent.

36.    The asserted claims of the '705 Patent expressly require a multi-camera imaging apparatus, such as smartphones and tablets, having the capability of capturing a first image of a scene that includes an object and a second higher resolution image that is a subset of the first scene and includes the object as well as, *inter alia*, "execute a distance calculation procedure, based upon at least one of the received images, to estimate the distance of at least one point on the object from the portable imaging apparatus," "execute an image blurring procedure, based at least in part upon the estimated distance, to reduce the image resolution of at least a portion of at least one of the received images," and "generate an output image that has at least two image areas, a first area that includes the object and is a subset of the second image, and a second area that at least partially surrounds the first area, wherein: the second area is blurred at least partially as a result of the image blurring procedure, and the resolution of the second area is less than the resolution of the first

12

image." *See, e.g.,* '705 Patent, 17:45–59. These elements improve upon digital imaging technology. In particular, a processor uses two images of a scene captured by separate cameras to calculate the distance to an object in the scene and effectively applying the distance information to generate an output image that resembles a human eye's view of the object (i.e., an object in focus, with out-of-focus periphery). Thus, the asserted claims of the '705 Patent are directed to specific improvements to digital imaging and are not abstract.

37. The asserted claims of the '705 Patent are directed to a specific field of application, a multi-camera image capture device, such as smartphones and tablets, or method, that utilizes a high resolution and lower resolution image of a scene to calculate distance from the cameras to an object for the purposes of generating an output image with an inner area with increased resolution and a surrounding area with decreased resolution in order to emphasize the object. The asserted claims of the '705 Patent therefore do not preempt others from using the general concepts of image enhancement or image alteration.

38. The asserted claims of the '705 Patent recite more than generic computer functionality and recite elements that were not purely conventional as of its priority date. The asserted claims of the '705 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "a first camera module having a first field of view, a first image resolution, and a first color filter array, for capturing a first image which is an image of a first scene that includes an object," "a second camera module having a second field of view, a second image resolution that is higher than the first image resolution, and a second color filter array, for capturing a second image, wherein: the second image is an image of a second scene that includes the object, the second scene is a subset of the first scene" and at least one processor configured to "execute a distance

13

calculation procedure, based upon at least one of the received images, to estimate the distance of at least one point on the object from the portable imaging apparatus," "execute an image blurring procedure, based at least in part upon the estimated distance, to reduce the image resolution of at least a portion of at least one of the received images," and "generate an output image that has at least two image areas, a first area that includes the object and is a subset of the second image, and a second area that at least partially surrounds the first area, wherein: the second area is blurred at least partially as a result of the image blurring procedure, and the resolution of the second area is less than the resolution of the first image." *See*, *e.g.*, '705 Patent, claim 1. These elements were not well-known, routine, or conventional at least because the capability of using a multi-camera device, such as smartphones and tablets, having two cameras to capture a scene, calculate the distance to an object within that scene, and use the distance to generate an output image with an inner area with increased resolution and a surrounding area with decreased resolution in order to emphasize the object did not exist in conventional imaging systems as of the priority date of the '705 Patent.

39.     The '782 Patent is related to the '244 Patent through a shared lineage tracing back through U.S. Patent No. 10,687,708 and U.S. Patent No. 10,064,552. The subject matter of the '782 Patent is rooted in digital imaging technology and, as of its priority date, provides unconventional solutions associated with capturing and processing images using multi-camera devices, such as smartphones and tablets, to achieve improved image resolution, enhanced visual output, and depth-based image effects through the coordinated use of multiple visible light cameras with overlapping fields of view.

40.     The asserted claims of the '782 Patent are directed to improving digital imaging technology through an imaging system, such as smartphones and tablets, comprising two visible

light cameras with overlapping fields of view mounted on a frame, an interface providing user-selectable imaging options, and a processor configured to coordinate the cameras to generate differing imaging options—including images with lowered resolution background or peripheral regions through the extraction of distance information—that could not be achieved by conventional imaging devices as of the priority date of the '782 Patent.

41.     The '782 Patent addresses and overcomes the limitations of conventional imaging devices by providing a multi-camera imaging system, such as smartphones and tablets, with multiple cameras mounted on a shared frame with a user interface that presents three distinct selectable imaging options across two visible light cameras. The '782 Patent describes an imaging system, such as smartphones and tablets, in which two cameras with overlapping fields of view are coupled to a shared frame, and provides the user with multiple modes through which they can view a scene, including using the first visible light camera individually, using the second visible light camera individually, or using both visible light cameras together. *See* '782 Patent, 5:42–55; 8:12–53; 15:63–16:3; Fig. 16; claims 1, 14. When the user selects the option to use both cameras together, the processor coordinates the two cameras to generate image data and display a visual image of the scene using data from both cameras, enabling enhanced imaging capabilities including the extraction of distance information associated with an object or feature in the scene to display an image with a lowered resolution background or peripheral region. '782 Patent, 4:44–48; 8:47–48; *see also* '782 Patent, claims 14–18.

42.     It is the coordinated capture by two visible light cameras with overlapping fields of view, the user-selectable imaging options enabling individual or joint camera operation, and the processor's ability to generate images accordingly, including the imaging system's ability to extract distance information from the jointly-captured image data, that allows for the generation

of enhanced images—including images with lowered resolution background or peripheral regions surrounding an object or feature—that are capabilities that could not be achieved by conventional imaging devices as of the priority date of the '782 Patent.

43. The asserted claims of the '782 Patent expressly require a multi-camera imaging system, such as smartphones and tablets, comprising a first visible light camera having a first field of view, a second visible light camera having a second field of view, an interface configured to present a plurality of selectable imaging options including a first imaging option corresponding to using the first visible light camera, a second imaging option corresponding to using the second visible light camera, and a third imaging option corresponding to using both visible light cameras, a frame configured to be carried or worn by a user wherein the first and second fields of view at least partially overlap, as well as, *inter alia*, at least one processor configured to receive a selection associated with the first or second imaging option using the respective first or second visible light camera to respectively generate image data associated with a scene, as well as receive a selection associated with the third imaging option to "(i) cause the first visible light camera to generate third image data that is associated with the scene, (ii) cause the second visible light camera to generate fourth image data that is associated with the scene, and (iii) cause the interface to display a visual image of the scene using at least a portion of the third image data and at least a portion of the fourth image data." *See, e.g.*, '782 Patent, claim 1. These elements improve upon digital imaging technology. In particular, the processor, responsive to a user's selection, coordinates the operation of two visible light cameras with overlapping fields of view to generate image data, alone or together with the other, and when together, produce a displayed visual image of the scene using data from both cameras—including the ability to extract distance information associated with an object or feature in the scene and display an image with a lowered resolution background or

peripheral region surrounding the object or feature. Thus, the asserted claims of the '782 Patent are directed to specific improvements to digital imaging and are not directed to an abstract idea.

44.     The asserted claims of the '782 Patent are directed to a specific field of application, a multi-camera imaging system, such as smartphones and tablets, with a frame and selectable imaging modes that utilizes, separately or together, two visible light cameras with overlapping fields of view to generate images, including images with lowered resolution of background or peripheral regions through the coordinated use of image data from both cameras. The asserted claims of the '782 Patent therefore do not preempt others from using the general concepts of image enhancement, image alteration, or multi-camera imaging.

45.     The asserted claims of the '782 Patent recite more than generic computer functionality and recite elements that were not purely conventional as of its priority date.  The asserted claims of the '782 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: a first visible light camera having a first field of view, a second visible light camera having a second field of view, an interface configured to present a plurality of selectable imaging options including options corresponding to using each camera individually or both cameras together, a frame with the cameras coupled such that their fields of view at least partially overlap, and at least one processor configured to receive a selection associated with the first or second imaging option using the respective first or second visible light camera to respectively generate image data associated with a scene, as well as receive a selection associated with the third imaging option to cause both cameras to generate image data and cause the interface to display a visual image of the scene using at least a portion of the data from each camera. *See, e.g.*, '782 Patent, claim 1. These elements were not well-known, routine, or conventional because of at least the

17

capability of an imaging system providing user-selectable imaging options to individually operate two visible light cameras or also coordinate the operation of the two visible light cameras, mounted on a frame with overlapping fields of view, with a processor configured to responsively cause the cameras to individually generate image data or also cause the both cameras together to generate image data and produce a displayed visual image using data from both cameras—including the ability to extract distance information associated with an object or feature in the scene and display an image with a lowered resolution background or peripheral region surrounding the object or feature—did not exist in conventional imaging systems as of the priority date of the '782 Patent.

46.    The subject matter of the '244 Patent is rooted in digital imaging technology and, as of its priority date, provides unconventional solutions associated with capturing and processing images using multi-camera devices, such as smartphones and tablets, to achieve improved image resolution, enhanced dynamic range, and improved visual output through the coordinated use of multiple cameras with differing optical characteristics.

47.    The asserted claims of the '244 Patent are directed to improving digital imaging technology through methods and apparatuses comprising a multi-camera imaging device, such as smartphones and tablets, with cameras having different color filter arrays and overlapping fields of view, a processor configured to receive and associate image data from the respective cameras, and generate enhanced output images with increased dynamic range that could not be achieved by a conventional imaging devices as of the priority date of the '244 Patent.

48.    The '244 Patent addresses and overcomes the limitations of imaging devices that are of a relatively small form factor. Such devices typically use smaller lenses and detector chips with lower pixel counts, which "degrades the resolution and quality of the video." '244 Patent, 9:64–10:9. The '244 Patent describes the solution of using two cameras with overlapping fields of

18

view to capture images of a scene—"a high resolution but narrow FOV and a lower resolution but wider FOV (similar to human peripheral view)." '244 Patent, 10:61–11:1. The '244 Patent further describes "a two camera configuration for High Dynamic Range (HDR) imaging" in which "one camera is used as the main camera and the other as the auxiliary" and "[t]he images from the auxiliary camera are used to adjust the dynamic range in each portion of the main image." '244 Patent, 14:14–23.

49.    It is the capture by two cameras of images of a scene by cameras having different color filter arrays and overlapping fields of view, and the association of image subsets from the respective cameras, that allows for the processor to increase the dynamic range of portions of the first scene image—a capability that could not be achieved by a conventional imaging device as of the priority date of the '244 Patent.

50.    The asserted claims of the '244 Patent expressly require a multi-camera imaging apparatus, such as smartphones and tablets, comprising a first camera having a first color filter array, a first field of view, a first image resolution, and a first plurality of image pixels for capturing a first scene image, and a second camera having a second color filter array, a second field of view, a second image resolution, and a second plurality of image pixels for capturing a second scene image, wherein the first and the second fields of view have an overlap, as well as, *inter alia*, at least one processor configured to "receive the first scene image from the first camera and the second scene image from the second camera," "associate a first subset of the first scene image to a subset of the second scene image wherein the associated first subset of the first scene image and the subset of the second scene image correspond to a first portion of the scene that is within the first and the second fields of view," and "take an action to increase the dynamic range of a second subset of the first scene image based upon the associated the first subset of the first scene image

19

to the subset of the second scene image wherein the second subset of the first scene image corresponds to a second portion of the scene that is not within the second field of view." *See, e.g.,* '244 Patent, claim 1. These elements improve upon digital imaging technology. In particular, the processor uses two images of a scene captured by separate cameras having different color filter arrays and overlapping fields of view to associate image subsets and increase the dynamic range of a portion of a first image that falls outside the second camera's field of view—a capability that did not exist in conventional imaging systems as of the priority date. Thus, the asserted claims of the '244 Patent are directed to specific improvements to digital imaging and are not directed to an abstract idea.

51.     The asserted claims of the '244 Patent are directed to a specific field of application, a multi-camera image capture device, such as smartphones and tablets, or method, that utilizes two cameras with different color filter arrays and overlapping fields of view to associate portions of captured scene images and increase the dynamic range of an image corresponding to a portion of the scene outside the second camera's field of view. The asserted claims of the '244 Patent therefore do not preempt others from using the general concepts of image enhancement, image alteration, or high dynamic range imaging.

52.     The asserted claims of the '244 Patent recite more than generic computer functionality and recite elements that were not purely conventional as of its priority date. The asserted claims of the '244 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: a first camera having a first color filter array, a first field of view, a first image resolution, and a first plurality of image pixels, and a second camera having a second color filter array, a second field of view, a second image resolution, and a second plurality of image pixels,

20

wherein the first and the second fields of view have an overlap, and at least one processor configured to "receive the first scene image from the first camera and the second scene image from the second camera," "associate a first subset of the first scene image to a subset of the second scene image wherein the associated first subset of the first scene image and the subset of the second scene image correspond to a first portion of the scene that is within the first and the second fields of view," and "take an action to increase the dynamic range of a second subset of the first scene image based upon the associated the first subset of the first scene image to the subset of the second scene image wherein the second subset of the first scene image corresponds to a second portion of the scene that is not within the second field of view." *See, e.g.*, '244 Patent, claims 1 and 8. These elements were not well-known, routine, or conventional because of at least the capability of using a multi-camera device, such as smartphones and tablets, having two cameras with different color filter arrays and overlapping fields of view to capture scene images, associate subsets of the respective images corresponding to overlapping portions of the scene, and use that association to increase the dynamic range of a portion of the first scene image corresponding to a portion of the scene outside the second camera's field of view did not exist in conventional imaging systems as of the priority date of the '244 Patent.

**DEFENDANT'S INFRINGING PRODUCTS**

53.    Smartphones and tablets have become adept at capturing digital images using multiple built-in cameras. These cameras offer different features for image effects, including image enhancement, portrait mode, and high dynamic range.  These smartphones and tablets contain processors programmed with instructions to capture and enhance images.  These processors work with the several device cameras to apply effects to the images and save each image to memory.

21

54.    Defendant Apple makes, uses, sells, offers for sale, and/or imports into the United States a variety of smartphones and tablets. These devices include, among others, Apple iPhones and iPads. Apple actively markets and supports sales of iPhones and iPads through its website and through third-party sellers, such as Best Buy, AT&T, Verizon Wireless, and T-Mobile stores.

55.    Apple devices are designed to take clear, high resolution digital photographs. Consumers often purchase these products for their ability to generate high resolution photographs with different visual effects. In order to achieve this, Apple has designed its smart devices with multiple cameras, each offering different capabilities and resolutions. These devices include, for example, a wide-angle camera, an ultra-wide camera, and at least one telephoto camera.

56.    Apple's smart devices include additional camera modes and features. Portrait mode is one such example, wherein the device utilizes at least two captured images to calculate distances to objects within the image scene in order to emphasize the object by blurring the area around the object, known as the "Bokeh" effect.

### COUNT I: INFRINGEMENT OF
### U.S. PATENT NO. 10,687,708

57.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 56 above.

58.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '708 Patent pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by making, having made, using, selling, offering to sell, and/or importing smart devices, such as smartphones and tablets, that embody the inventions claimed in the '708 Patent, in particular, at least claims 1 and 8, within the United States and within this District. Apple has been and is engaged in one or more of these direct infringing activities related to its smartphones and tablets, including at least: (i) iPhone 17 Pro Max, iPhone

17 Pro, iPhone 17, iPhone 16 Pro Max, iPhone 16 Pro, iPhone 16, iPhone 15 Pro Max, iPhone 15 Pro, iPhone 15, iPhone 14 Pro Max, iPhone 14 Pro, iPhone 14, iPhone 13 Pro Max, iPhone 13 Pro, iPhone 13, iPhone 12 Pro Max, iPhone 12 Pro, iPhone 12, iPhone 11 Pro Max, iPhone 11 Pro, iPhone 11, iPhone XS Max, iPhone XS, and iPhone X, and (ii) any other device, such as iPads, that comprise two or more cameras and includes the Portrait mode (collectively hereinafter the "'708 Apple Accused Products").

59.    Apple sells the '708 Apple Accused Products to distributors, retailers, and/or other customers throughout the United States, and actively markets and supports sales, including through its website.

60.    Notice of the factual bases of Plaintiff's allegations of infringement by the '708 Apple Accused Products is provided in the claim charts filed as Exhibits E and F.[1]  Exhibits E and F demonstrate how the '708 Patent is infringed by reference to the iPhone 16 and iPhone 16 Pro Max devices, which, on information and belief, are representative of the infringing aspects of at least the devices identified in Paragraph 58. The attached infringement charts are based on Plaintiff's current understanding of the '708 Apple Accused Products based on information publicly available at the time of this filing. This selection of claims and products should not be considered limiting of Apple's infringement.  Additional claims and products will be disclosed, as appropriate, in compliance with this Court's rules related to infringement contentions and discovery.

61.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, is indirectly infringing the '708 Patent, including at least claims 1 and 8, pursuant to 35

---

[1] The exhibits illustrate the infringement of the respective devices as to the asserted apparatus claims.  The asserted method claims are likewise infringed on the same bases as addressed regarding the apparatus claims.

U.S.C. § 271(b) by actively inducing acts of direct infringement performed by others. Apple's customers directly infringe at least by using the '708 Apple Accused Products. Apple retail partners, distributors, and resellers directly infringe at least by selling and offering for sale such products.

62.     Apple has actual notice of the '708 Patent and the infringement alleged herein at least upon the service of this Complaint. The timing, circumstances, and extent of Apple obtaining any actual knowledge of the '708 Patent prior to commencement of this lawsuit will be confirmed during discovery.

63.     Apple indirectly infringes the '708 Patent by inducing third parties, including customers, to use the '708 Apple Accused Products in their normal and customary way and for their intended purpose. For example, on information and belief, Apple also induces such third parties by (i) selling the '708 Apple Accused Products to third parties when such products are designed to infringe the '708 Patent in normal and intended modes of operation; (ii) enabling third parties to use the products when such use infringes the '708 Patent; (iii) providing technical support, specifications, user guides, manuals, technical information, and instructions for operating the '708 Apple Accused Products in their customary way; (iv) advertising and promoting the '708 Apple Accused Products, including assisting purchasers in locating local dealers for specific smart devices, through its website and various promotional materials; and/or (v) providing ongoing warranties, support, maintenance, and registration to such third parties relating to the '708 Apple Accused Products.

64.     Upon information and belief, Apple knows that its customers, distributors, and resellers follow and/or use Apple's support, instructions, user guides, and technical specifications and use, offer to sell, or sell the '708 Apple Accused Products within the United States. Apple

directly benefits from and actively and knowingly encourages customers', distributors', and resellers' use, sale, and/or offer for sale of the '708 Apple Accused Products.

65. On information and belief, Apple will continue to engage in activities to encourage customers, distributors, and resellers that will constitute inducement of infringement, and with the actual intent to cause the acts that it knows or should know would induce direct infringement and/or willful blindness of a high probability that the activities result in the infringement of the '708 Patent.

66. Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has contributed to and/or will continue to contribute to the direct infringement by customers, resellers and/or end users of infringing smart devices pursuant to 35 U.S.C. § 271(c) in this District and elsewhere in the United States at least by providing the '708 Apple Accused Products for use in practicing the patented method, knowing that such devices are material to the invention claimed by at least claim 1 of the '708 Patent, and are especially made or especially adapted for use in infringing the patented method and are not a staple article or commodity of commerce suitable for substantial non-infringing use.

67. Apple's direct and indirect infringement of the '708 Patent has injured Plaintiff, and Plaintiff is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless Apple ceases its infringing activities, it will continue to injure Plaintiff.

68. On information and belief, Apple continues to infringe the '708 Patent by making, using, selling, offering for sale and/or importing in the United States the '708 Apple Accused Products and by inducing and/or contributing to the direct infringing use of the '708 Apple Accused Products by others, in reckless disregard of Plaintiff's patent rights. Apple continues its infringement notwithstanding actual knowledge of the '708 Patent (including through service of

this Complaint) and without a good faith basis to believe that its activities do not infringe any valid claim of the '708 Patent. Apple's infringement of the '708 Patent, following its knowledge of the '708 Patent, is intentional and deliberate and thus willful and Plaintiff is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

69.    On information and belief, Apple will continue intentionally and deliberately infringing, notwithstanding actual knowledge of the '708 Patent. Apple's future acts of infringement will constitute continuing willful infringement of the '708 Patent.

## COUNT II: INFRINGEMENT OF
## U.S. PATENT NO. 10,623,705

70.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 69 above.

71.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '705 Patent pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by making, having made, using, selling, offering to sell, and/or importing smart devices that embody the inventions claimed in the '705 Patent, in particular, at least claim 1, within the United States and within this District.  Apple has been and is engaged in one or more of these direct infringing activities related to its smartphones and tablets, including at least: iPhone 17 Pro Max, iPhone 16 Pro Max, iPhone 15 Pro Max, iPhone 14 Pro Max, iPhone 13 Pro Max, iPhone 12 Pro Max, iPhone 11 Pro Max, and iPhone XS Max, and (ii) any other device, such as iPads, that comprise two or more cameras, includes the Portrait mode, and the field of view of the higher resolution camera is between 2 to 5 times smaller than the lower resolution camera (collectively hereinafter the "'705 Apple Accused Products").

72.    Apple sells the '705 Apple Accused Products to distributors, retailers, and/or other customers throughout the United States, and actively markets and supports sales, including through its website.

73.    Notice of the factual bases of Plaintiff's allegations of infringement by the '705 Apple Accused Products is provided in the claim charts filed as Exhibit G. Exhibit G demonstrates how the '705 Patent is infringed by reference to the iPhone 16 Pro Max, which, on information and belief, is representative of the infringing aspects of at least the devices identified in Paragraph 71. The attached infringement chart is based on Plaintiff's current understanding of the '705 Apple Accused Products based on information publicly available at the time of this filing. This selection of claims and products should not be considered limiting of Apple's infringement. Additional claims and products will be disclosed, as appropriate, in compliance with this Court's rules related to infringement contentions and discovery.

74.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, is indirectly infringing the '705 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(b) by actively inducing acts of direct infringement performed by others. Apple's customers directly infringe at least by using the '705 Apple Accused Products. Apple retail partners, distributors, and resellers directly infringe at least by selling and offering for sale such products.

75.    Apple has actual notice of the '705 Patent and the infringement alleged herein at least upon the service of this Complaint. The timing, circumstances, and extent of Apple obtaining actual knowledge of the '705 Patent prior to commencement of this lawsuit will be confirmed during discovery.

76.    Apple indirectly infringes the '705 Patent by inducing third parties, including customers, to use the '705 Apple Accused Products in their normal and customary way and for

their intended purpose.  For example, on information and belief, Apple also induces such third parties by (i) selling the '705 Apple Accused Products to third parties when such products are designed to infringe the '705 Patent in normal and intended modes of operation; (ii) enabling third parties to use the products when such use infringes the '705 Patent; (iii) providing technical support, specifications, user guides, manuals, technical information, and instructions for operating the '705 Apple Accused Products in their customary way; (iv) advertising and promoting the '705 Apple Accused Products, including assisting purchasers in locating local dealers for specific smart devices, through its website and various promotional materials; and/or (v) providing ongoing warranties, support, maintenance, and registration to such third parties relating to the '705 Apple Accused Products.

77.    Upon information and belief, Apple knows that its customers, distributors, and resellers follow and/or use Apple's support, instructions, user guides, and technical specifications and use, offer to sell, or sell the '705 Apple Accused Products within the United States.  Apple directly benefits from and actively and knowingly encourages customers', distributors', and resellers' use, sale, and/or offer for sale of the '705 Apple Accused Products.

78.    On information and belief, Apple will continue to engage in activities to encourage customers, distributors, and resellers that will constitute inducement of infringement, and with the actual intent to cause the acts that it knows or should know would induce direct infringement and/or willful blindness of a high probability that the activities result in the infringement of the '705 Patent.

79.    Apple's direct and indirect infringement of the '705 Patent has injured Plaintiff, and Plaintiff is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless Apple ceases its infringing activities, it will continue to injure Plaintiff.

80.     On information and belief, Apple continues to infringe the '705 Patent by making, using, selling, offering for sale and/or importing in the United States the '705 Apple Accused Products and by inducing the direct infringing use of the '705 Apple Accused Products by others, in reckless disregard of Plaintiff's patent rights.  Apple continues its infringement notwithstanding actual knowledge of the '705 Patent (including through service of this Complaint) and without a good faith basis to believe that its activities do not infringe any valid claim of the '705 Patent. Apple's infringement of the '705 Patent, following its knowledge of the '705 Patent, is intentional and deliberate and thus willful and Plaintiff is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

81.     On information and belief, Apple will continue intentionally and deliberately infringing, notwithstanding actual knowledge of the '705 Patent. Apple's future acts of infringement will constitute continuing willful infringement of the '705 Patent.

## COUNT III: INFRINGEMENT OF
## U.S. PATENT NO.   12,336,782

82.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 81 above.

83.     Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '782 Patent pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, by making, having made, using, selling, offering to sell, and/or importing smart devices that embody the inventions claimed in the '552 Patent, in particular, at least claim 1 and 14–20, 22-23, within the United States and within this District. Apple has been and is engaged in one or more of these direct infringing activities related to its smart devices, including at least: (i) iPhone 17 Pro Max, iPhone 17 Pro, iPhone 17, iPhone 16 Pro Max, iPhone 16 Pro, iPhone 16, iPhone 15 Pro Max, iPhone 15 Pro, iPhone 15, iPhone 14

Pro Max, iPhone 14 Pro, iPhone 14, iPhone 13 Pro Max, iPhone 13 Pro, iPhone 13, iPhone 12 Pro Max, iPhone 12 Pro, iPhone 12, iPhone 11 Pro Max, iPhone 11 Pro, iPhone 11, iPhone XS Max, iPhone XS, and iPhone X, and (ii) any other device, such as iPads, that comprise two or more cameras and includes the capability for user-based imaging options, including the capability for Portrait Mode (collectively hereinafter the "'782 Apple Accused Products").

84.    Apple sells the '782 Apple Accused Products to distributors, retailers, and/or other customers throughout the United States, and actively markets and supports sales, including through its website.

85.    Notice of the factual bases of Plaintiff's allegations of infringement by the '782 Apple Accused Products is provided in the claim charts attached as Exhibits H and I.  Exhibits H and I demonstrate how the '782 Patent is infringed by reference to the iPhone 16 and iPhone 16 Pro Max, which, on information and belief, are representative of the infringing aspects of at least the devices identified in Paragraph 83. The attached infringement charts are based on Plaintiff's current understanding of the '782 Apple Accused Products based on information publicly available at the time of this filing.  This selection of claims and products should not be considered limiting of Apple's infringement.  Additional claims and products will be disclosed, as appropriate, in compliance with this Court's rules related to infringement contentions and discovery.

86.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, is indirectly infringing the '782 Patent, including at least claims 1 and 14-20, 22–23, pursuant to 35 U.S.C. § 271(b) by actively inducing acts of direct infringement performed by others.  Apple's customers directly infringe at least by using the '782 Apple Accused Products. Apple retail partners, distributors, and resellers directly infringe at least by selling and offering for sale such products.

30

87.     Apple has had actual notice of the '782 Patent and the infringement alleged herein at least upon the service of this Complaint.  The timing, circumstances, and extent of Apple obtaining actual knowledge of the '782 Patent prior to commencement of this lawsuit will be confirmed during discovery.

88.     Apple indirectly infringes the '782 Patent by inducing third parties, including customers, to use the '782 Apple Accused Products in their normal and customary way and for their intended purpose.  For example, on information and belief, Apple also induces such third parties by (i) selling the '782 Apple Accused Products to third parties when such products are designed to infringe the '782 Patent in normal and intended modes of operation; (ii) enabling third parties to use the products when such use infringes the '782 Patent; (iii) providing technical support, specifications, user guides, manuals, technical information, and instructions for operating the '782 Apple Accused Products in their customary way; (iv) advertising and promoting the '782 Apple Accused Products, including assisting purchasers in locating local dealers for specific smart devices, through its website and various promotional materials; and/or (v) providing ongoing warranties, support, maintenance, and registration to such third parties relating to the '782 Apple Accused Products.

89.     Upon information and belief, Apple knows that its customers, distributors, and resellers follow and/or used Apple's support, instructions, user guides, and technical specifications and have used, offered to sell, or sold the '782 Apple Accused Products within the United States. Apple directly benefits from and actively and knowingly encourages customers', distributors', and resellers' use, sale, and/or offer for sale of the '782 Apple Accused Products.

90.     On information and belief, Apple will continue to engage in activities to encourage customers, distributors, and resellers that will constitute inducement of infringement, and with the

actual intent to cause the acts that it knows or should know would induce direct infringement and/or willful blindness of a high probability that the activities result in the infringement of the '782 Patent.

91.    Apple's direct and indirect infringement of the '782 Patent has injured Plaintiff, and Plaintiff is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless Apple ceases its infringing activities, it will continue to injure Plaintiff.

92.    On information and belief, Apple continues to infringe the '782 Patent by making, using, selling, offering for sale and/or importing in the United States the '782 Apple Accused Products and by inducing the direct infringing use of the '782 Apple Accused Products by others, in reckless disregard of Plaintiff's patent rights.  Apple continues its infringement notwithstanding actual knowledge of the '782 Patent (including through service of this Complaint) and without a good faith basis to believe that its activities do not infringe any valid claim of the '782 Patent. Apple's infringement of the '782 Patent, following its knowledge of the '782 Patent, is intentional and deliberate and thus willful and Plaintiff is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

93.    On information and belief, Apple will continue intentionally and deliberately infringing, notwithstanding actual knowledge of the '782 Patent. Apple's future acts of infringement will constitute continuing willful infringement of the '782 Patent.

## COUNT IV: INFRINGEMENT OF
## U.S. PATENT NO. 11,800,244

94.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 93 above.

95.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has in the past and continues to directly infringe the '244 Patent pursuant to 35 U.S.C. §

32

271(a), either literally or under the doctrine of equivalents, by making, having made, using, selling, offering to sell, and/or importing smart devices that embody the inventions claimed in the '244 Patent, in particular, at least claim 1, within the United States and within this District.  Apple has been and is engaged in one or more of these direct infringing activities related to its smartphones and tablets, including at least: (i) iPhone 17 Pro Max, iPhone 16 Pro Max, iPhone 15 Pro Max, iPhone 14 Pro Max, iPhone 13 Pro Max, iPhone 12 Pro Max, iPhone 11 Pro Max, and iPhone XS Max and (ii) any other device, such as iPads, that comprise two or more cameras and includes the capability to increase dynamic range (collectively hereinafter the "'244 Apple Accused Products").

96.    Apple sells the '244 Apple Accused Products to distributors, retailers, and/or other customers throughout the United States, and actively markets and supports sales, including through its website.

97.    Notice of the factual bases of Plaintiff's allegations of infringement by the '244 Apple Accused Products is provided in the claim charts filed as Exhibit J.  Exhibit J demonstrates how the '244 Patent is infringed by reference to the iPhone 16 Pro Max device, which, on information and belief, is representative of the infringing aspects of at least the devices identified in Paragraph 95.  The attached infringement chart is based on Plaintiff's current understanding of the '244 Apple Accused Products based on information publicly available at the time of this filing. This selection of claims and products should not be considered limiting of Apple's infringement. Additional claims and products will be disclosed, as appropriate, in compliance with this Court's rules related to infringement contentions and discovery.

98.    Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, is indirectly infringing the '708 Patent, including at least claim 1, pursuant to 35 U.S.C. § 271(b) by actively inducing acts of direct infringement performed by others.  Apple's customers

directly infringe at least by using the '244 Apple Accused Products. Apple retail partners, distributors, and resellers directly infringe at least by selling and offering for sale such products.

99.    Apple has actual notice of the '244 Patent and the infringement alleged herein at least upon the service of this Complaint. The timing, circumstances, and extent of Apple obtaining any actual knowledge of the '244 Patent prior to commencement of this lawsuit will be confirmed during discovery.

100.    Apple indirectly infringes the '244 Patent by inducing third parties, including customers, to use the '244 Apple Accused Products in their normal and customary way and for their intended purpose. For example, on information and belief, Apple also induces such third parties by (i) selling the '244 Apple Accused Products to third parties when such products are designed to infringe the '244 Patent in normal and intended modes of operation; (ii) enabling third parties to use the products when such use infringes the '244 Patent; (iii) providing technical support, specifications, user guides, manuals, technical information, and instructions for operating the '244 Apple Accused Products in their customary way; (iv) advertising and promoting the '244 Apple Accused Products, including assisting purchasers in locating local dealers for specific smart devices, through its website and various promotional materials; and/or (v) providing ongoing warranties, support, maintenance, and registration to such third parties relating to the '244 Apple Accused Products.

101.    Upon information and belief, Apple knows that its customers, distributors, and resellers follow and/or use Apple's support, instructions, user guides, and technical specifications and use, offer to sell, or sell the '244 Apple Accused Products within the United States. Apple directly benefits from and actively and knowingly encourages customers', distributors', and resellers' use, sale, and/or offer for sale of the '244 Apple Accused Products.

102. On information and belief, Apple will continue to engage in activities to encourage customers, distributors, and resellers that will constitute inducement of infringement, and with the actual intent to cause the acts that it knows or should know would induce direct infringement and/or willful blindness of a high probability that the activities result in the infringement of the '244 Patent.

103. Apple, directly and/or through its subsidiaries, affiliates, agents, and/or business partners, has contributed to and/or will continue to contribute to the direct infringement by customers, resellers and/or end users of infringing smart devices pursuant to 35 U.S.C. § 271(c) in this District and elsewhere in the United States at least by providing the '244 Apple Accused Products for use in practicing the patented method, knowing that such devices are material to the invention claimed by at least claims 1 and 8 of the '244 Patent, and are especially made or especially adapted for use in infringing the patented method and are not a staple article or commodity of commerce suitable for substantial non-infringing use.

104. Apple's direct and indirect infringement of the '244 Patent has injured Plaintiff, and Plaintiff is entitled to recover damages adequate to compensate for such infringement pursuant to 35 U.S.C. § 284. Unless Apple ceases its infringing activities, it will continue to injure Plaintiff.

105. On information and belief, Apple continues to infringe the '244 Patent by making, using, selling, offering for sale and/or importing in the United States the '244 Apple Accused Products and by inducing and/or contributing to the direct infringing use of the '244 Apple Accused Products by others, in reckless disregard of Plaintiff's patent rights. Apple continues its infringement notwithstanding actual knowledge of the '244 Patent (including through service of the Complaint) and without a good faith basis to believe that its activities do not infringe any valid claim of the '244 Patent. Apple's infringement of the '244 Patent, following its knowledge of the

'244 Patent, is intentional and deliberate and thus willful and Plaintiff is entitled to treble damages and attorneys' fees and costs incurred in this action under 35 U.S.C. §§ 284 and 285.

106.    On information and belief, Apple will continue intentionally and deliberately infringing, notwithstanding actual knowledge of the '244 Patent. Apple's future acts of infringement will constitute continuing willful infringement of the '244 Patent.

## JURY DEMANDED

107.    In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury on all issues triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

i.    A judgment declaring that Apple has directly and/or indirectly infringed and is directly and/or indirectly infringing one or more claims of the Asserted Patents;

ii.    A judgment awarding Plaintiff compensatory damages as a result of Apple's infringement of one or more claims of the Asserted Patents, together with pre-and post-interest and costs, including supplemental damages for any continuing post-verdict or post-judgment infringement with an accounting as needed;

iii.    A judgment awarding Plaintiff treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of Apple's willful and deliberate infringement of one or more claims of the Asserted Patents;

iv.    A judgment declaring this case exceptional and awarding Plaintiff its expenses, costs, and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

36

v.      A grant of a permanent injunction enjoining Defendant from further acts of infringement of one or more claims of the Asserted Patents without additional compensation to Plaintiff in an amount to be determined by the Court; and

vi.      Such other and further relief the Court deems just and equitable.

Dated: May 21, 2026

Respectfully Submitted,

*/s/ Daniel S. Stringfield w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
Ty Wilson
Texas Bar No. 24106583
twilson@davisfirm.com
**DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Tel: (903) 230-9090
Fax: (903) 230-9661

Daniel S. Stringfield (Admitted W.D. Tex.)
IL Bar No. 6293893
dstringfield@nixonpeabody.com
Timothy P. Maloney (Admitted W.D. Tex.)
IL Bar No. 6216483
tmaloney@nixonpeabody.com
Randal S. Alexander (*Pro Hac Vice* forthcoming)
IL Bar No. 6298199
ralexander@nixonpeabody.com
Daniel D. Georgiev (*Pro Hac Vice* forthcoming)
IL Bar No. 6326950
Texas State Bar No. 24136166
dgeorgiev@nixonpeabody.com
**NIXON PEABODY LLP**
70 W. Madison St. Suite 5200
Chicago, IL 60602
Tel: (312) 977-4400
Fax: (312) 977-4405

Patrick O. Doyle (Admitted W.D. Tex.)
CA Bar No. 329810
pdoyle@nixonpeabody.com
**NIXON PEABODY LLP**
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111
Tel: (415) 984-8200
Fax: (415) 984-8300

***Attorneys for Plaintiff Optics Innovation LLC***

38